| | | |
|---|---|---|
| SHAWN GERMAINE FRALEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| | ) | |
| FNU SPAVENTA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment.

[Doc. 32].

## I.     BACKGROUND

### A.     Procedural Background

Pro se Plaintiff Shawn Germaine Fraley, a North Carolina inmate currently incarcerated at

Pasquotank Correctional Institution in Elizabeth City, North Carolina, filed this action on

November 3, 2017, pursuant to 42 U.S.C. § 1983.  Plaintiff has named the following individual

Defendants in this matter: (1) FNU Spaventa, identified as a correctional officer at Alexander

Correctional Institution ("Alexander"); (2) FNU Walker, identified as a correctional officer at

Alexander; and (3) FNU Poteat, identified as a Unit Manager at Alexander.  Plaintiff alleges that

on May 20, 2017, at 10:00 pm, while Plaintiff was incarcerated at Alexander in C-block on the

Red Unit, Defendants Spaventa and Walker physically and sexually assaulted Plaintiff.   Plaintiff

alleges that Defendant Poteat was the Unit Manager at Alexander and violated Plaintiff's due

process rights by refusing to allow Plaintiff to attend the disciplinary hearing for charges against

Plaintiff related to the incident on May 20, 2017. Plaintiff was found guilty of three charges. Plaintiff seeks injunctive relief and compensatory and punitive damages. [Doc. 1]. The Plaintiff's complaint survived initial review under 28 U.S.C. § 1915(e)(2). [Doc. 9].

On June 19, 2019, Defendants filed the pending summary judgment motion. [Doc. 32]. On June 20, 2018, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. [Doc. 35]. Plaintiff timely filed his response to Defendants' motion. [Doc. 36]. On December 2, 2019, the Court, on its own motion, ordered the Defendants to file videographic and photographic evidence referenced in their summary judgment brief. [Doc. 40]. Defendants thereafter filed that evidence. [Docket Text Entry 12/11/2019].

**B.     Factual Background**

**1.     Defendants' Summary Judgment Materials**

In support of the summary judgment motion, Defendants rely on incident reports by various correctional officers and other witnesses submitted following the incident, certain videographic and photographic evidence, disciplinary reports, and other prison records and policies, as well as on the affidavits of Benjamin Carver, Defendant Spaventa, and Defendant Walker. [See Docs. 34-1 through 34-7]. Defendants' forecast of evidence shows the following:

Defendants Spaventa and Walker are and were, at the relevant times, correctional officers at Alexander. [Doc. 34-3 at ¶ 3: Spaventa Affidavit; Doc. 34-4 at ¶ 3: Walker Affidavit]. On the evening of May 20, 2017, Alexander was placed on lockdown so that a "Code 2" formal count of

inmates could be conducted.[1]  [Doc. 34-4 at ¶ 6].  At approximately 9:11 p.m.,[2] Defendant Spaventa was counting for Code 2 on LPOD.  While doing so, he observed Plaintiff "talking at LPOD C-15" after being told by another officer to lockdown for Code 2.  [Doc. 34-3 at ¶ 6]. Defendant Spaventa proceeded through the wing to count inmates in their cells and to get Plaintiff secured in his cell.  [Id.].  As Defendant Spaventa approached Plaintiff, Plaintiff was in conversation with the inmate in cell C-15.  Defendant Spaventa told Plaintiff it was Code 2 and time to lockdown.  Plaintiff, without breaking eye contact with the inmate in cell C-15, said "I know!" and continued to talk to the other inmate.  [Id.].  At this time, Defendant Walker was located on the mezzanine level in LPOD C wing to participate in the lockdown count.  [Doc. 34-4 at ¶ 6].  Defendant Walker heard Defendant Spaventa order Plaintiff to lockdown.  [Id.].  Defendant Walker observed Plaintiff ignore the order, as Plaintiff was talking to the other inmate, who was in his cell.  [Id.].

Defendant Spaventa then ordered Plaintiff to his cell to lockdown.  Plaintiff responded, "I fucking know man! I will go." [Doc. 34-3 at ¶ 7].  At that time Plaintiff made no movement toward his cell, C-19.  [Id.].  Defendant Spaventa tried to guide Plaintiff away from C-15 with his right hand, placing it near Plaintiff's left arm.  [Id.].  Plaintiff snatched his arm away and Defendant Spaventa ordered that Plaintiff submit to handcuffs.  Plaintiff then turned and started to walk into his cell.  [Id.; Doc. 34-4 at ¶ 7].  While this was occurring, Defendant Walker came down the stairwell and continued to observe Plaintiff ignoring Defendant Spaventa's order and being argumentative.  Defendant Walker then ordered that Plaintiff submit to handcuffs.  [Doc. 34-4 at

---

[1] Policy requires that formal counts be conducted to ensure accountability.  Formal counts must be reconciled with the Offender Population Unified System ("OPUS"), an electronic database containing comprehensive inmate records.  [Doc. 34-4 at ¶ 6].

[2] It appears from the onus of the record, including time-stamped videographic evidence, that Defendant Walker's reference to "9:11 p.m." is a typographical error and should read "9:01 p.m."

¶ 8]. Plaintiff refused Defendant Walker's order, walking away from Defendants toward his cell. [Id.]. Not knowing whether Plaintiff had any weapons in his cell, Defendant Spaventa then repeated his order that Plaintiff submit to handcuffs. [Doc. 34-3 at ¶ 8]. Plaintiff then turned toward Defendant Spaventa and, in an aggressive manner, grabbed Defendant Spaventa's hand and pulled him into the cell. [Id.; Doc. 34-4 at ¶ 8].

Defendant Spaventa called for assistance and placed Plaintiff against the wall, attempting to gain control of his left arm and wrist to begin handcuffing him. [Doc. 34-3 at ¶ 9]. Defendant Walker rushed toward Plaintiff and assisted in securing him to the wall, gaining control of Plaintiff and handcuffing him. [Id.; Doc. 34-4 at ¶ 8]. Sergeant Leonard Murphy and Officers John Snyder and Leigh Hensley arrived at Plaintiff's cell. Sergeant Murphy also assisted in restraining Plaintiff. [Doc. 34-1 at 39]. Officer Hensley stepped into Plaintiff's cell but observed that the situation was under control. [Id. at 48]. At no time during this incident did Defendant Spaventa punch Plaintiff in the face. [Doc. 34-3 at ¶ 10; Doc. 34-4 at ¶ 10].

Officer Snyder and Sergeant Murphy escorted Plaintiff to restrictive housing assisted by Defendant Walker and Officer Hensley. [Doc. 34-4 at ¶ 9; Doc. 34-1 at 39; Doc. 34-1 at 48]. Defendant Spaventa did not escort Plaintiff to Restrictive Housing. [Doc. 34-3 at ¶ 9]. During the escort, Plaintiff was irate and continued to resist. [Doc. 34-1 at 39]. Plaintiff tried repeatedly to pull away from the other escorting staff. [Doc. 34-4 at ¶ 9]. Shortly after Plaintiff arrived in Restrictive Housing and pursuant to policy, he was assessed by medical staff. [Doc. 34-1 at 35, 39-40, 42; Doc. 34-1 at 54]. Plaintiff refused to make a verbal or written statement on his behalf for the incident report. [Id.].

As a result of this incident, a disciplinary investigation was conducted. On May 30, 2017, Sergeant Murphy met with the Plaintiff as part of the investigation. [Doc. 34-1 at 69, 76]. Plaintiff

requested that a witness statement be gathered from inmate LC-40, who was identified as Darrell Debnam, and that the video footage be reviewed at the disciplinary hearing. [Id. at 69, 76]. Plaintiff specifically requested not to have live witnesses or staff assistance at the hearing. [Id.]. A witness statement was requested of Inmate Debnam, but he refused to complete or sign the witness statement form. [Doc. 34-1 at 69, 77]. This refusal was witnessed and documented by two other officers. [Id. at 69]. Sergeant Murphy requested and reviewed the video footage of the incident, noting that it "clearly supports the remaining evidence." [Id. at 69]. Plaintiff did provide a witness statement as part of the investigation into possible charges against Plaintiff. In his statement, he writes:

> Sgt. Murphy came to my cell [on May 30, 2017,] he said I did something on 5/20/17. It was count time. Upon going to my cell officer Walker and Officer Spaventa grabbed me instead of securing my cell door and telling me to submit to the cuffs. They both came in my cell. They did not mase me. Officer Walker laid on me with his penis on my butt. While Walker was putting the cuffs on me officer Spaventa assaulted me punched me in my face 3 times. The nurse seen it and pictures of my face was taken. I want to file a incident report. I did not see a statement. Its 5/30/17. He said it happened on 5/20/17. My left eye was swollen the pictures will prove it. I did nothing wrong. Walker and officer Spaventa did not follow proper procedure. I want to file a warrant for sexuall assault and assault + batteries My rights has been violated. Camera footage will prove this.

[Doc. 34-1 at 76 (spelling and grammatical errors in original)].

As a result of the investigation, Sergeant Murphy recommended that Plaintiff be charged with three infractions, assault on staff (A-03), profane language (C-02), and disobeying a direct order (C-03). [Id. at 69]. Plaintiff made no plea to these charges. [Doc. 34-1 at 61]. On March 30, 2017, Plaintiff was provided and signed written notice of the claimed violations. [Id. at 73]. On June 6, 2017, a disciplinary hearing was held on these charges. [Id. at 63]. Plaintiff refused to attend the disciplinary hearing. [Id. at 63, 64]. A Record of Hearing was prepared. The Record

provides that the evidence supporting the charges includes the statement by Defendant Spaventa

and the Investigating Officer's Report, which is quite detailed and includes review of the video

evidence. [Doc. 34-1 at 63; see Doc. 34-1 at 68-70]. Plaintiff was found guilty of the charges and

punishment was imposed "to deter future acts of this nature." [Doc. 34-1 at 63]. The records show

that Plaintiff received a total of 50 days in segregation and 130 "extra duty" hours as punishment.

No loss of good time credits was imposed. [Doc. 34-1 at 62]. On August 8, 2017, after Plaintiff

was transferred to Lanesboro Correctional Institution, Plaintiff filed a grievance related to the

alleged refusal to allow Plaintiff to attend the disciplinary hearing. [Doc. 34-2 at 29].

### 2. Plaintiff's Summary Judgment Materials

In opposition to Defendants' summary judgment motion, Plaintiff filed a "Statement of the

Case" and his own Affidavit. [Docs. 36, 36-1]. Plaintiff's "Statement of the Case" is an unsigned,

unsworn recitation of allegations by Plaintiff, which cannot be considered by the Court in assessing

whether Plaintiff has forecast sufficient evidence to survive summary judgment. [See Doc. 36;

Fed. R. Civ. P. 56]. In Plaintiff's sworn Affidavit, he testifies, in pertinent part, as follows:

> Correctional Officer Spaventa and Correctional Officer Walker ran
> in my cell and assaulted me on May 20th 2017 on c-block red unit
> Alexander. Officer Spaventa assaulted me punching me in the face
> numerous times, while correctional officer Walker handcuffed me
> behind my back assaulting me sexually touching me inappropriately
> and placing his penis on my buttocks. When I was escorted to
> segregation photos were taken of my face which was swollen,
> camera footage of the whole incident is available as evidence as well
> as color photos. All this evidence is on record. Unit Manager Poteat
> did not allow me to attend disciplinary hearing, my hearing was held
> I was not allowed to attend. I was in segregation asking correctional
> officers they stated I wasn't on the list. Correctional staff at
> Alexander Correctional Institution was trying to cover up they
> actions, Plaintiffs U.S. Constitutional rights were violated and
> NCDPS policy and procedures were not followed. These are true
> facts evidence in the record.

[Doc. 36-1: Plaintiff's Affidavit]

On December 9, 2019, Plaintiff filed a letter with the Court in which Plaintiff sets forth his position regarding the video footage and photographic evidence in this case. [Doc. 39]. He states, in pertinent part, as follows:

> The surveillance video footage and color photos is Plaintiff's evidence. Plaintiff asked for this when this action was first filed. I the Plaintiff want this surveilance video footage and color photos as evidence in this case. This is evidence. Don't try to take my evidence. I stated this in the beginning of this case…. Camera footage is in the incident report and Alexander C.I. Medical staff took pictures upon use of force. All this is policy and procedure. All this is in this case. This is evidence in this case. The video footage and color photos are not support in the Defendants summary judgment motion.

[Doc. 39 (spelling and grammatical errors in original)].

### 3. The Video and Photographic Evidence

Both parties rely on video and photographic evidence in support of their respective positions on summary judgment. The Court has carefully observed and reviewed the video footage, and makes the following observations:[3]

The video footage wholly supports Defendants' version of events. At approximately 9:02 p.m., Plaintiff can be seen drinking from a water fountain in the Red Unit. Plaintiff remains there for about 10 seconds and then walks toward the cells in the Unit. After walking past several cell doors, Plaintiff approaches and stops at one of them. He can be seen standing at this cell door, talking to the inmate inside, for approximately 10 seconds, when Defendant Spaventa enters the Red Unit. Defendant Spaventa proceeds through the lower level of the Unit, looking inside each cell window, presumably counting inmates. The video shows only Defendant Spaventa's backside as he walks along counting inmates. Defendant Spaventa soon reaches where Plaintiff is standing,

---

[3] There is no audio component to the video footage. As such, the Court cannot comment on what words were exchanged between the individuals depicted in the footage.

still talking outside this other inmate's cell. Plaintiff and Defendant Spaventa begin an obvious exchange during which Defendant Spaventa appears calm and composed while Plaintiff appears agitated and is gesticulating. Plaintiff does not move from where he is standing. Defendant Spaventa attempts to place his right hand on Plaintiff's left upper arm and Plaintiff pulls his arm away. Defendant Walker appears very soon thereafter, having walked down the stairs from the mezzanine level. Defendant Walker approaches Plaintiff and Defendant Spaventa. Plaintiff then starts walking toward his cell, seemingly nonchalantly at this point. Plaintiff enters his cell while Defendant Spaventa is in the doorway. Defendant Spaventa is clearly yanked into the Plaintiff's cell by his hand. Although the video does not show Plaintiff actually yanking Defendant Spaventa into his cell, it is the only plausible explanation for what is shown. Defendant Walker follows quickly into the cell. After about 40 seconds, three more officers, two male and one female, appear in the Red Unit and proceed quickly to Plaintiff's cell. After another 15 seconds or so, Plaintiff is being removed from his cell, in handcuffs, and escorted out of the Red Unit. Plaintiff is agitated and combative, frequently turning back toward the escorting officers, appearing to be speaking to them in an aggressive manner. The video footage shows Plaintiff's path from Red Unit to restrictive housing where he is placed in the shower and eventually monitored by a single guard.

There is also photographic evidence in the record. Photographs of the Plaintiff were taken at approximately 9:30 p.m. on the day of the incident. The photographs show a rip on the back of Plaintiff's shirt, which did not appear in the footage showing Plaintiff walk toward his cell from the water fountain. A photograph of Plaintiff's face may show some swelling around his left eye, but the glare, the angle, the lighting, and lack of contrast make this difficult to discern.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324.  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255.  Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).

## III.  DISCUSSION

### A.  Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

When an inmate claims that prison officials used excessive force on him, he must meet a higher standard to establish the subjective standard. This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances." Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous." Id. (citing Whitley, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that

officials applied force maliciously and sadistically for the very purpose of causing harm." <u>Id.</u> (internal quotations and citation omitted).

In adjudicating an excessive force claim, the court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and whether the force was "applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur…. But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." <u>Whitley</u>, 475 U.S. at 321.

Further, the Court must "accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise 'we would give encouragement to insubordination in an environment which is already volatile enough.'" <u>Scarbro v. New Hanover County</u>, 374 Fed. App'x 366, 370 (4th Cir. 2010) (quoting <u>Grayson v. Peed</u>, 195 F.3d 692, 697 (4th Cir. 1999)).

The Plaintiff's alleges and argues a single ground for the use of excessive force, that is, the alleged assault by Defendant Spaventa in Plaintiff's cell. Plaintiff's story, however, is wholly contradicted by the record, such that no reasonable juror could believe it. <u>Scott</u>, 550 U.S. at 380, 127 S. Ct. at 1776. Plaintiff repeatedly directs the Court to the video evidence of the incident, claiming that it is "his evidence" and that it supports his version of events. [Docs. 36-1, 39]. It

does not    The video evidence completely contradicts Plaintiff's story and corroborates the Defendants' version of events.

Plaintiff claims he did nothing wrong.  Plaintiff alleges that Defendants Spaventa and Walker "ran in [his] cell and assaulted" him.  [Doc. 36-1]. The evidence of record, including indisputable video evidence, is to the contrary.  Plaintiff refused to stop talking to another inmate through the other inmate's cell door, became agitated and aggressive when Defendant Spaventa attempted to gently guide Plaintiff to his cell, and then yanked Defendant Spaventa into his cell by Spaventa's hand.  Defendants Spaventa and Walker had no choice but to enter Plaintiff's cell (and in fact Defendant Spaventa was forced there by Plaintiff) to gain control of the situation, particularly not knowing why Plaintiff yanked Spaventa into his cell or whether Plaintiff had a weapon there.  Because Plaintiff's story is completely contradicted by the record as a whole, the Court should not adopt it for the purpose of ruling on Defendants' summary judgment motion.  See Scott, 550 U.S. at 380, 127 S. Ct. at 1776.  Further, Plaintiff has failed to show that any force used on him was done maliciously and sadistically for the very purpose of causing harm and not to quell a disturbance and maintain and restore discipline.  See Williams, 77 F.3d at 761; Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).  This is particularly true where video evidence shows Plaintiff assaulting Defendant Spaventa and escalating an already precarious situation.

The Plaintiff's forecast of evidence, therefore, creates no genuine issue of material fact relevant to whether Defendant Spaventa used excessive force against the Plaintiff.  The Court will grant summary judgment on Plaintiff's claim of use of excessive force against Defendant Spaventa.

**B.** **Sexual Assault**

The Eighth Amendment also protects inmates from sexual abuse. Schwenk v. Hartford, 204 F.3d 1187, 1196-97 (9th Cir. 2000); Jackson v. Holley, 666 Fed. App'x 242, 244 (4th Cir. 2016) ("There can be little doubt that sexual abuse is repugnant to contemporary standards of decency, and that allegations of sexual abuse can amount to an Eighth Amendment violation."). "The Supreme Court has held, however, that 'not every malevolent touch by a prison guard gives rise to a federal cause of action.'" Jackson, 666 Fed. App'x at 244 (citing Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S. Ct. 1175 (2010)). "An inmate who complains of a push or a shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 559 U.S. at 38, 130 S. Ct. 1175 (internals quotation marks omitted).

Although Fourth Circuit law on this issue is underdeveloped, Jackson is highly instructive. In Jackson, the plaintiff alleged that a female prison guard (1) sent him one "sexually explicit and lurid" letter, (2) "posed up" seductively before the plaintiff and whispered sexually explicit words to him, and (3) "planted" her groin area in the plaintiff's face while he was seated for his haircut in the barber's chair. 666 Fed. App'x at 244. The Fourth Circuit held that this conduct, even if true, does not amount to an Eighth Amendment violation. Id. (citing Wilkins, 559 U.S. at 38-39, 130 S. Ct. 1175).

Here, Plaintiff alleges in his Complaint that Defendant Walker "plac[ed] his penis" on Plaintiff. [Doc. 1 at 4]. Plaintiff did not elaborate on this accusation in any way. In his Affidavit in response to Defendants' summary judgment materials, Plaintiff states that, while Defendant Walker handcuffed Plaintiff behind his back, Walker "assault[ed] him sexually touching me inappropriately and placing his penis on my buttocks." [Doc. 36-1 at 1]. While the Court must give the Plaintiff the benefit of every reasonable inference, the Court need not and should not

entertain scenarios that are highly improbable if not impossible. Given the very short length of time after Plaintiff yanked Defendant Spaventa into his cell (after which Defendant Walker quickly followed) and before the other guards arrived at Plaintiff's cell, the Court strains to interpret Plaintiff's allegation to mean that Defendant Walker literally removed his penis from inside his pants and "placed" it on Plaintiff. Rather, if anything, it seems possible that in the course of trying to gain control of and handcuff Plaintiff, that Defendant Walker's body and groin area may have been in contact with Plaintiff's buttocks. If this is the case, then Plaintiff's claim of sexual assault easily fails at summary judgment. Further, even if Defendant Walker actually removed his penis from his pants and placed it on Plaintiff's buttocks, which his highly improbable and would have necessarily been for an exceedingly short period of time, this single act is insufficient to support a finding of an Eighth Amendment violation. See Jackson v. Madery, 158 F. App'x 656, 661-62 (6th Cir. 2005) (allegation of rubbing and grabbing a prisoner's buttocks in a degrading manner was not sufficient to amount to an Eighth Amendment violation); Williams v. Anderson, No. 03-3254, 2004 WL 2282927 (D. Kan. Sept. 7, 2004) (prison official's acts of making crude sexual remarks, exposing his penis to the inmate, and grabbing the inmate's buttocks were not enough to state a constitutional claim).

Plaintiff, therefore, has failed to forecast sufficient evidence of a constitutional violation against Defendant Walker. Plaintiff's claim for sexual assault will be dismissed. Further, given the lack of circuit authority regarding whether sexual harassment by prison officials amounts to a constitutional violation, the Court also finds that it was not unreasonable for Walker to have "failed to appreciate that his conduct would violate [Plaintiff's] rights." Meyers v. Baltimore Cty., 713 F. 3d 723, 731 (4th Cir. 2013) (internal quotations omitted). As such, even if the alleged conduct by Walker is sufficient to state an Eighth Amendment violation, Walker is entitled to qualified

immunity under the second prong of that inquiry, that is, whether the right violated was clearly established.  Jackson, 666 Fed. App'x 244-45, fn.

  **C.**  **Due Process**

  As to Plaintiff's claim against Defendant Poteat, Plaintiff contends that "Unit Manager Poteat did not allow [him] to attend [his] disciplinary hearing, my hearing was held [and] I was not allowed to attend."  [Doc. 36-1 at 1].

  To prevail on a procedural due process claim, an inmate must first demonstrate that he was deprived of "life, liberty, or property" by governmental action.  Bevrati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).  Although prisoners are afforded some due process rights while incarcerated, those liberty interests are limited to "the freedom from restraint which, while not exceeding the sentence in such and unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).  The Supreme Court has repeatedly held that a prisoner has no constitutional right under the due process clause to be incarcerated in a particular facility or to be held in a specific security classification, barring some showing by the prisoner that his confinement posed an atypical and significant hardship in relationship to the ordinary incidents of prison life.  See Wilkinson v. Austin, 545 U.S. 209 (2005); Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976); Hewitt v. Helms, 459 U.S. 460, 468 (1976).  Moreover, changes "in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison."  Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991); Slezak v. Evatt, 21 F.3d 590, 594 (4th Cir. 1994) ("The federal constitution itself

vests no liberty interest in inmates in retaining or receiving any particular security or custody status '[a]s long as the [challenged] conditions or degree of confinement ... is within the sentence imposed ... and is not otherwise violative of the Constitution.'") (quoting <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983)).

"Where a prison disciplinary hearing may result in the loss of good time credits, <u>Wolff</u> held that the inmate must receive (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." <u>Superintendent, Mass. Correctional Institution v. Hill</u>, 105 S. Ct. 2768 (1985) (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 94 S. Ct. 2963 (1974)).

Although Defendants' forecast of evidence establishes that Plaintiff refused to attend his disciplinary hearing, the Court assumes for the sake of argument that Plaintiff is telling the truth and examines the uncontroverted evidence is assessing whether this claim survives summary judgment in any event. The uncontradicted forecast of evidence shows as follows: (1) Plaintiff was given advanced written notice of the claimed violation, (2) Plaintiff's hearing was held on June 6, 2017; (3) Plaintiff did not attend the hearing; (4) Plaintiff requested before the hearing that a statement be taken from a fellow inmate as evidence; (5) that this fellow inmate refused to give a statement; (6) Plaintiff requested that video footage of the incident be used as evidence at the hearing; (7) video footage was in fact used as evidence at the hearing, (8) the hearing officer's decision was based on record evidence, included a written statement of factual findings, and the reasons for disciplinary action; and (9) Plaintiff's punishment included 50 days in segregation, 130 "extra duty" hours, and no loss of good time credits.

Here, Plaintiff has failed to forecast sufficient evidence that he was deprived of "life, liberty, or property" by governmental action beyond that which is contemplated by the ordinary incidents of prison life. The undisputed evidence shows that Plaintiff lost no good time credits. Plaintiff's punishment included time in segregation and extra work. Further, even if it were true that Plaintiff was not allowed to attend his hearing, all procedural safeguards that are required when an inmate may ultimately be deprived of life, liberty or property were in place.

Finally, the Court notes that Defendants Walker and Poteat also raise qualified immunity as a defense. Qualified immunity shields "government officials performing discretionary functions … from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants, therefore, are entitled to qualified immunity if either their conduct did not violate any constitutional rights, or the right was not clearly established. Pearson v. Callahan, 555 U.S. 223, 232 (2009). Here, Plaintiff has failed to forecast sufficient evidence that Defendants' conduct violated any constitutional rights. As such, Defendants are also entitled to qualified immunity.

In sum, for the reasons stated herein, Defendants' motion for summary judgment is granted.

## IV.   CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. 32] is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is respectfully instructed to terminate this action.

Signed: January 22, 2020

Frank D. Whitney
Chief United States District Judge